1  **HAGENS BERMAN**
2  Reed R. Kathrein (139304)
   715 Hearst Avenue, Suite 202
3  Berkeley, California 94710
   Tel.: (510) 725-3000
4  Fax:  (510) 725-3001
5  reed@hbsslaw.com

6  **RIGRODSKY & LONG, P.A.**
7  SETH D. RIGRODSKY
   TIMOTHY J. MACFALL
8  585 Stewart Avenue, Suite 304
9  Garden City, New York 11530
   Tel.:  (516) 683-3516
10 Fax:  (302) 654-7530

11

12 *Attorneys for Plaintiff Brenda Chau*

13 [Additional Counsel Appear on Signature Page]

14         **UNITED STATES DISTRICT COURT**

15         **CENTRAL DISTRICT OF CALIFORNIA**

16 BRENDA CHAU, Individually and ) Case No.  **CV10-09517 RGK (PJWx)**
17 On Behalf of All Others Similarly )
   Situated,                       ) **CLASS ACTION**
18                                  )
19                    Plaintiff,    ) **COMPLAINT FOR VIOLATION**
                                    ) **OF THE FEDERAL SECURITIES**
20         v.                       ) **LAWS**
                                    )
21 RINO INTERNATIONAL             )
22 CORPORATION, JIANPING QIU,     )
   DEJUN ZOU, KENNITH C.          )
23 JOHNSON, XIE QUAN, ZEJIN LI,   )
   JENNY LIU, BRUCE RICHARDSON,   )
24                                  )
25 QUAN XIE and WEIGUO ZHANG,     ) **JURY TRIAL DEMANDED**
                    Defendants.    )
26 _____)

27

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 1 -

FILED

2010 DEC 10 PM 4: 15

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
SANTA ANA

BY

Plaintiff, Brenda Chau ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things: a review of the Defendants' public documents, media reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases regarding RINO International Corporation ("RINO" or "the Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of all purchasers of the common stock of RINO, who purchased or otherwise acquired the Company's common stock between May 15, 2008 and November 19, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      RINO is a holding company which, thorough its subsidiaries and controlled affiliates, engages in industrial technology-based, environmental protection and remediation in the People's Republic of China (the "PRC").  RINO designs, manufactures, installs and services wastewater treatment and exhaust emission desulphurization equipment principally for use in China's iron and steel industry, as well as anti-oxidation products and equipment designed for use in the manufacture of

hot rolled steel plate products. All of the Company's products are custom-built for specific project installations.

3. According to the Company, the main cause of airborne pollution in the PRC is sulfur dioxide emissions from coal, with sulphur dioxide-induced acid rain costing China more than $13.3 billion annually in various losses.  RINO states that in 2005, the latest year for which statistics are available, the Chinese iron & steel industry discharged 1.24 million metric tons of sulphur dioxide into the atmosphere. Based on government mandates, over the next few years, coal-fired sinters and other like furnace operations must install desulphurization equipment or face stiff, monthly penalties or, possibly, have their operations shut down. RINO claims that the Company's Desulphurization System is the only sinter processing equipment available in the PRC market that is specifically designed for flue gas desulphurization applications that are larger than 90 square meters - the standard size for sinter operations in the PRC iron & steel industry.  Accordingly, RINO states that the Company has a substantial competitive advantage over its international competitors.

4. Throughout the Class Period, the Company represented that it was experiencing steady financial growth due, in large part, to the success of its Flue Gas Desulphurization equipment ("FGD") sales.  For example, in its annual report for 2008, filed with the SEC on March 31, 2009 on Form 10-K (the "2008 10-K"), RINO stated:

Our desulphurization system has been installed in steel mills such as Jinan Iron & Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel, Handan Iron & Steel, Chongqing Iron & Steel. and Kunming Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel, Qianjing Iron & Steel and Yuhua Iron & Steel. *For fiscal years 2007 and 2008, revenues generated from our desulphurization business was $33.1 million and $105.3 million, respectively, representing 52.3% and 75.6% of our total revenues for fiscal years 2007 and 2008, respectively.* [Emphasis added.]

5.     The Company further reported in its 2008 10-K: "[f]or the year ended December 31, 2008, the Company had 25 flue gas desulphurization contracts and sales amounted to $105.3 million compared with 5 contracts and $33.1 million sales for the year ended December 31, 2007."

6.     Likewise, in its annual report for 2009, filed with the SEC on March 31, 2010 on Form 10-K (the "2009 10-K"), RINO reported: "[f]or the year ended December 31, 2009, we recorded revenues of $116.4 million, as compared to revenues of $105.3 million for the year ended December 31, 2008, representing an increase of 10.6%."   The Company further reported that FGD sales comprised approximately 60.4% of RINO's total sales for 2009.

7.     Based on the Company's increasingly favorable financial results, RINO received positive analyst coverage throughout the Class Period.   For example, on October 15, 2010, RINO was selected by Forbes.com as one of "Five Chinese Stocks Buffett Would Love."   Similarly, on October 25, 2010, RINO was selected for *The Motley Fool's* "Wall Street Buy List."

8.      Unbeknownst to the market, however, while RINO was reporting increasingly favorable financial results driven by its FGD business, certain of its reported contracts were, in fact, non-existent and, therefore, the Company's publicly reported financial statements materially inaccurate.

9.      The truth began to emerge on November 10, 2010 when Muddy Waters, LLC ("MW"), a small research firm that purports to specialize in Chinese companies which acknowledged holding a short position in RINO, issued a research report about, and "Strong Sell" recommendation for, the Company.  In that report, MW states, among other things, that RINO had fabricated the existence of at least five of the nine customer contracts for FGD equipment reported in the Company's public filings. Moreover, MW reported that filings with the PRC's State Administration of Industry and Commerce ("SAIC") showed that the Company's 2009 consolidated revenue was only $11.1 million, as opposed to the $192.6 million reported in the Company's SEC filings.

10.     The price of the Company's stock fell approximately 28% on the publication of the MW report, from a close of $15.52 per share on November 9, 2010, the day before the publication of the MW report, to a close of 11.10 per share on November 11, 2010, the first full trading day after the report was published.

11.     On November 15, 2010, the Company announced its third quarter 2010 financial results, reporting total revenues in the third quarter of 2010 of $52.7 million, a 16.7% decrease from the corresponding period in 2009; operating profit in the third

quarter of 2010 of $9.9 million, a 49.3% decrease from the corresponding period in 2009; net income in the third quarter of 2010 of $8.8 million, a 48.3% decrease from the corresponding period in 2009; and diluted earnings per share ("EPS") for the third quarter of 2010 was $0.31, a 60.8% decrease from $0.78 for the corresponding period in 2009.

12.    On news of the disappointing third quarter 2010 results, the price of the Company's stock further dropped from a close of $11.01 per share on November 12, 2010, the last trading day prior to the publication of the results, to a close of $7.55 per share on November 15, 2010, the day the third quarter results were released.

13.    On November 16, 2010, the Company postponed a previously scheduled earnings conference call.  On that news, the price of the Company's stock further dropped, from a close of $7.15 per share on November 16, 2010, to a close of $6.07 per share on November 17, 2010.  At midday on November 17, 2010, trading in RINO stock was suspended.  It was subsequently reported that trading was suspended at the request of the Company based on advice of its counsel.

14.    Finally, on November 19, 2010, the Company filed a Form 8-K with the SEC in which it acknowledged that certain of the allegations made by MW were accurate, and that the company had, in fact, fabricated the existence of at least two contractual relationships:

> On November 17, 2010 Frazer Frost, LLP, the independent auditors of RINO International Corporation (the "Registrant"), delivered a letter (the

"Auditor's Letter") to the Registrant and each of its directors. The Auditor's Letter states in part:

"In a telephone conversation on November 16, 2010, Mr. Zou Dejun, the Chief Executive Officer of the Company, informed Ms. Susan Woo of our firm, in substance, that as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company *did not in fact enter into two of the six purported contracts,* and a third contract among the six was explainable. *When Ms. Woo inquired about the Company's other contracts, Mr. Zou said he was not sure, but there might be problems with 20 - 40% of them.* Assuming that these statements were reasonably accurate, it appears that our reports would have been affected if this information had been known to us at the date of our reports, although the effect on the financial statements is currently unknown and cannot be quantified without a thorough investigation. We further note that in a conversation the following day, November 17, 2010, involving Ms. Woo, several directors of the Company, Company counsel, and Mr. Zou, Mr. Zou stated that he was not sure the day before and went back to look into some things, and found that apart from the two problematic contracts, all other contracts are legitimate and can be verified.

The auditing standards of the Public Company Accounting Oversight Board provide procedures to be followed by an auditor to prevent continued reliance on audit reports in such circumstances. In view of the information provided by Mr. Zou Dejun, we hereby advise the Company to promptly notify any person or entity that is known to be relying upon or is likely to rely upon *our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 that they should no longer be relied upon,* and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."  [Emphasis added.]

15.    In a separate Form 8-K also filed on November 19, 2010, the Company further reported:

On November 18, 2010, the Board of Directors (the "Board") of RINO International Corporation (the "Registrant") a Nevada corporation, *concluded that previously issued audited financial statements of the*

*Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.*

The conclusion of the Board that the financial statements for the above-described periods should not be relied upon was based on statements made by the Registrant's Chief Executive Officer, Mr. Zou Dejun, after consultation with the Registrant's Chief Accountant, who reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the Registrant's 2008 and 2009 fiscal years. [Emphasis added.]

16.     In a press release dated November 19, 2010, the NASDAQ stated that:

Trading in the company's stock had been halted on November 17, 2010 at 11:54:11 a.m. Eastern Time for "news pending" at a last sale price of $6.07. Trading will remain halted until RINO International Corporation has fully satisfied NASDAQ's request for additional information.

17.     Plaintiff and the members of the Class who were unaware that certain of the Company's contractual relationships were fabricated, and that RINO's financial results were, therefore, materially misstated, purchased their shares of RINO common stock at artificially inflated prices during the Class Period and have sustained injury thereby.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

20.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff, Brenda Chau, purchased RINO common stock at artificially inflated prices during the Class Period, as set forth in the attached Certification, and has been damaged thereby.

23.     Defendant RINO International Corporation is a Nevada corporation with its principal executive offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China.  The Company's common stock trades on the NASDAQ Stock Exchange under the ticker symbol "RINO."  In its 2009 10-K, the Company described itself as "engaged in the business of environmental protection and remediation. Our business consists of designing, manufacturing, installing and

servicing wastewater treatment and flue gas desulphurization equipment principally for use in China's iron and steel industry, and anti-oxidation products and equipment designed for use in the manufacture of hot rolled steel plate products."  RINO is a holding company and described its corporate structure as follows:

> At the present, RINO International's sole business activities are acting as a holding company of our direct and indirect subsidiaries, Innomind Group Limited, a company organized under the laws of the British Virgin Islands, RINO Investment (Dalian) Co., Ltd. ("RINO Investment"), a wholly-owned subsidiary of the Company under the PRC law with its wholly-owned subsidiary in China, Dalian RINO Heavy Industries Co., Ltd. ("RINO Heavy Industries"), and Dalian Innomind Environment Engineering Co., Ltd. ("Dalian Innomind"), a limited liability company organized under the laws of the People's Republic of China ("PRC"), which contractually controls and operates our affiliate Dalian Rino Engineering Science and Technology Co., Ltd. ("Dalian Rino"), a limited liability company organized under the laws of the PRC, and its subsidiaries Dalian Rino Environmental Engineering Design Co., Ltd.("Dalian Rino Design"), Dalian Rino Environmental Construction and Installation Engineering Project Co., Ltd., ("Dalian Rino Installation") and RINO Technology Corporation, a Nevada corporation ("RINO Technology").

24.     Defendant Dejun Zou ("Zou") is, and at all times relevant hereto has been, the Company's Chief Executive Officer ("CEO").

25.     Defendant Jianping Qui ("Qui") is, and since 2008 has been, the Chairman of the Company's Board of Directors ("Chairman").

26.     Defendant Kennith Johnson ("Johnson") is, and since March 2008 has been, a director of the Company.

27.     Defendant Zejin Li ("Li") is, and at all times relevant hereto has been, a director of the Company.

28.     Defendant Jenny Liu ("Liu") was the Company's CFO from June 2009 through April 2010.

29.     Defendant Ben Wang ("Wang") is, and since April 2010 has been, the Company's CFO.

30.     Defendant Li Yu ("Yu") is, and at all times relevant hereto has been, the Company's accounting manager.  Yu has served as the Company's Chief Accounting Officer since November 2009.

31.     Defendants Bruce Richardson ("Richardson") was the Company's Chief Financial Officer ("CFO") from September 2007 through September 2008.

32.     Defendant Quan Xie ("Xie") is, and at all times relevant hereto has been, a director of the Company.

33.     Defendant Zhang Weiguo ("Weiguo") is, and at all times relevant hereto has been, a director of the Company.

34.     The Defendants identified paragraphs 24 through 32 above are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of RINO's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to

be corrected. Because of their positions and access to material, non-public information available to them, each of these Defendants knew, or recklessly disregarded, that the Company's internal controls were inadequate, which was not disclosed to, and was being concealed from, the public, and that certain of the customer relations and contracts identified in RINO's public filings and statements had been fabricated. Accordingly, these Defendants knew that the financial results reported for 2008 and 2009 on Forms 10-Q and 10-K filed with the SEC were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

35.     On May 15, 2008, RINO filed its quarterly report for the period ended March 31, 2008, with the SEC on Form 10-Q (the "1Q 2008 Form 10-Q").  In that 10-Q the Company reported that net FGD sales for the first quarter 2008 of $12,471,100, approximately 65.5% of the Company's total sales, compared to first quarter 2007 net FGD sales of $3,164,600, approximately 32.3% of RINO's total sales for the first quarter 2007.  According to the Company, this was an increase of 294.1%.

36.     In the 1Q 2008 10-Q, RINO also reported revenues of $19,045,425, compared to revenues of $9,790,321 for the first quarter of 2007; gross profit of $7,722,567 for the first quarter 2008, compared to $4,899,131 in the first quarter

2007; and net income of $5,020,346, compared to net income of $3,408,956 for the same quarter in the prior year.

37.    The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated. Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

38.    Attached as exhibits to the 1Q 2008 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Wang, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In those Certifications, Individual Defendants Zou and Wang certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

39.    The foregoing Certifications were materially false and misleading because the 1Q 2008 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated. Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the

Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

40.    On August 14, 2008, RINO filed its quarterly report for the period ended June 30, 2008, with the SEC on Form 10-Q (the "2Q 2008 Form 10-Q").  In that 10-Q the Company reported that net FGD sales for the second quarter 2008 of $25,000,000, approximately 72.2% of the Company's total sales, compared to second quarter 2007 net FGD sales of $5,249,000, approximately 26.1% of RINO's total sales for the second quarter 2007.  According to the Company, this was an increase of 372.6%.

41.    In the 2Q 2008 10-Q, RINO also reported revenues of $34,617,114 (or $53,662,539 for the six months ended June 30, 2008), compared to revenues of $18,702,621 for the second quarter of 2007 (or $28,492,942 for the six months ended June 30, 2007); gross profit of $15,281,655 for the second quarter 2008 (or $23,044,222 for the six months ended June 30, 2008), compared to $10,088,658 in the second quarter 2007 (or $14,987,789 for the six months ended June 30, 2007); and net income of  $5,387,367 (or $10,407,713 for the six months ended June 30, 2008), compared to net income of  $3,767,714 for the same quarter in the prior year (or $7,176,670 for the six months ended June 30, 2007).

42.    The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the

Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

43.    Attached as exhibits to the 2Q 2008 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Richardson, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In those Certifications, Individual Defendants Zou and Richardson certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

44.    The foregoing Certifications were materially false and misleading because the 2Q 2008 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

45.    On November 12, 2008, RINO filed its quarterly report for the period ended September 30, 2008, with the SEC on Form 10-Q (the "3Q 2008 Form 10-Q").  In that 10-Q the Company reported that net FGD sales for the third quarter 2008 of $37,712,000, approximately 84% of the Company's total sales, compared to third

quarter 2007 net FGD sales of $12,274,000, approximately 69.5% of RINO's total sales for the third quarter 2007.  According to the Company, this was an increase of 207.3%.

46.    In the 3Q 2008 10-Q, RINO also reported revenues of $44,881,136 (or $98,543,675 for the nine months ended September 30, 2008), compared to revenues of $17,638,961 for the third quarter of 2007 (or $46,131,903 for the nine months ended September 30, 2007); gross profit of $20,567,715 for the third quarter 2008 (or $43,571,937 for the nine months ended September 30, 2008), compared to $7,330,697 in the third quarter 2007 (or $22,318,486 for the nine months ended September 30, 2007); and net income of  $9,857,114 (or $20,264,827 for the nine months ended September 30, 2008), compared to net income of  $4,266,688 for the same quarter in the prior year (or $11,443,358 for the nine months ended September 30, 2007).

47.    The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

48.    Attached as exhibits to the 3Q 2008 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Qui, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

In those Certifications, Individual Defendants Zou and Qui certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

49.    The foregoing Certifications were materially false and misleading because the 3Q 2008 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the  "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

50.    On March 31, 2009, RINO filed its 2008 10-K.  In the 2008 10-K, RINO reported that for fiscal years 2007 and 2008, revenues generated from its desulphurization business was $33.1 million and $105.3 million, respectively, representing 52.3% and 75.6% of its total revenues for fiscal years 2007 and 2008, respectively.

51.    The revenues reportedly generated from the Company's desulphurization business in 2008, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the

"previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

52.    In the 2008 10-K, the Company further reported:

Our desulphurization system has been installed in steel mills such as Jinan Iron & Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel, Handan Iron & Steel, Chongqing Iron & Steel. and Kunming Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel, Qianjing Iron & Steel and Yuhua Iron & Steel.

53.    The foregoing statement identifying RINO's FGD customers was materially false and misleading.  As the Company reported on November 19, 2010, Individual Defendant Zou, RINO's CEO, informed the Company's auditor, Frazer Frost LLP, on November 16, 2010, that the Company did not in fact enter into two of the six purported contracts discussed in the MW report (Yueyufeng, Yuhua, Lai, Chongqing, Nanchangchangli and Bao Steel) and a third contract among the six was "explainable."  Individual Defendant Zou also stated that "there might be problems with 20-40%" of the other contracts.

54.    The Company further reported in the 2008 10-K that 2008 net sales from FGD equipment was $105,288,000, 75.6% of total sales, compared to $33,140,000 in net FGD sales in 2007, which was 52.3% of the Company's total sales in 2007. According to the 2008 10-K, this was an increase of 217.7%.

55.     Further, the 2008 10-K reported the following audited financial results: $139,343,397 in revenues for 2008, compared to revenues of $63,386,808 in revenues for 2007; gross profit of $54,334,164 for 2008, compared to $30,465,864 for 2007; and net income of $21,281,724 for 2008, compared to $10,218,805 for 2007.

56.     The foregoing financial results were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

57.     Attached as exhibits to the 2008 10-K were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Qui, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In those Certifications, Individual Defendants Zou and Qui certified, *inter alia*, that the Form 10-K contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-K disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

58.   The foregoing Certifications were materially false and misleading because the 2008 10-K included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

59.   On May 15, 2009, RINO filed its quarterly report for the period ended March 31, 2009, with the SEC on Form 10-Q (the "1Q 2009 Form 10-Q").  In that 10-Q the Company reported that net FGD sales for the first quarter 2009 of $25,704,000, approximately 72.2% of the Company's total sales, compared to first quarter 2008 net FGD sales of $12,471,000, approximately 65.5% of RINO's total sales for the first quarter 2008.  According to the Company, this was an increase of 106.1%.

60.   In the 1Q 2009 10-Q, RINO also reported revenues of $35,608,119, compared to revenues of $19,045,425 for the first quarter of 2008; gross profit of $15,950,638 for the first quarter 2009, compared to $7,722,567 in the first quarter 2008; and net income of $12,474,916 , compared to net income of $5,020,346 for the same quarter in the prior year.

61.   The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company

announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

62.    Attached as exhibits to the 1Q 2009 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Qui, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In those Certifications, Individual Defendants Zou and Qui certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

63.    The foregoing Certifications were materially false and misleading because the 1Q 2009 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the  "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

64.    On August 10, 2009, RINO filed its quarterly report for the period ended June 30, 2009, with the SEC on Form 10-Q (the "2Q 2009 Form 10-Q").  In that 10-Q the Company reported that net FGD sales for the second quarter 2009 of $30,083,000,

approximately 73.9% of the Company's total sales, compared to second quarter 2008 net FGD sales of $25,000,000, approximately 72.2% of RINO's total sales for the second quarter 2008.  According to the Company, this was an increase of 20.3%.

65.     In the 2Q 2009 10-Q, RINO also reported revenues of $40,722,250 (or $76,330,369 for the six months ended June 30, 2009), compared to revenues of $34,617,114 for the second quarter of 2008 (or $53,663,539 for the six months ended June 30, 2008); gross profit of $14,167,569 for the first quarter 2009 (or $30,118,207 for the six months ended June 30, 2009), compared to $15,281,655 in the second quarter 2008 (or $23,004,222 for the six months ended June 30, 2008); and net income of  $9,855,284 (or $22,330,200 for the six months ended June 30, 2009), compared to net income of  $5,387,367 for the same quarter in the prior year (or $10,407,713 for the six months ended June 30, 2009).

66.     The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

67.     Attached as exhibits to the 2Q 2009 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Liu, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

In those Certifications, Individual Defendants Zou and Liu certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

68.    The foregoing Certifications were materially false and misleading because the 2Q 2009 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the  "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

69.    On November 13, 2009, RINO filed its quarterly report for the period ended September 30, 2009, with the SEC on Form 10-Q (the "3Q 2009 Form 10-Q"). In that 10-Q the Company reported that net FGD sales for the third quarter 2009 of $33,269,000, approximately 52.6% of the Company's total sales, compared to third quarter 2008 net FGD sales of $37,712,000, approximately 84% of RINO's total sales for the third quarter 2008.  According to the Company, this was a decrease of 11.8%.

70.    In the 3Q 2009 10-Q, RINO also reported revenues of $63,302,203 (or $139,632,572 for the nine months ended September 30, 2009), compared to revenues of $44,881,136 for the third quarter of 2008 (or $98,543,675 for the nine months

ended September 30, 2008); gross profit of $26,133,067 for the third quarter 2009 (or $56,251,274 for the nine months ended September 30, 2009), compared to $20,567,715 in the third quarter 2008 (or $43,571,937 for the nine months ended September 30, 2008); and net income of $17,085,900 (or $39,416,100 for the nine months ended September 30, 2009) , compared to net income of $39,416,100 for the same quarter in the prior year (or $20,264,827 for the nine months ended September 30, 2009).

71.     The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

72.     Attached as exhibits to the 3Q 2009 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Liu, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. In those Certifications, Individual Defendants Zou and Liu certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and

that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

73.    The foregoing Certifications were materially false and misleading because the 3Q 2009 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the  "interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."

74.    On March 31, 2010, RINO filed its 2009 10-K with the SEC.  In the 2009 Form 10-K, RINO reported that for fiscal years 2008 and 2009, revenues generated from its desulphurization business was $105.3 million and $116.4 million, respectively, representing 75.6% and 60.4% of its total revenues for fiscal years 2008 and 2009, respectively.

75.    The revenues reportedly generated from the Company's desulphurization business in 2008 and 2009, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

76.     In the 2009 10-K, the Company further reported:

Our desulphurization system has been installed in steel mills such as Jinan Iron and Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel, Handan Iron & Steel, Chongqing Iron & Steel. and Kunming Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel, Qianjing Iron & Steel ,Yuhua Iron & Steel, Zhuhai Yueyufeng Iron & Steel,Hefei Iron &Steel, Jiangsu Xigang Iron &Steel, Zhangdian Iron & Steel and Hunan Lianyuan Iron & Steel.

77.     The foregoing statement identifying RINO's FGD customers was materially false and misleading. As the Company reported on November 19, 2010, Individual Defendant Zou, RINO's CEO, informed the Company's auditor, Frazer Frost LLP, on November 16, 2010, that the Company did not in fact enter into two of the six purported contracts discussed in the MW report (Yueyufeng, Yuhua, Lai, Chongqing, Nanchangchangli and Bao Steel) and a third contract among the six was "explainable."  Individual Defendant Zou also stated that "there might be problems with 20-40%" of the other contracts.

78.     The Company further reported in the 2009 10-K that 2008 net sales from FGD equipment was $116,403,000, 60.4% of total sales, compared to $105,288,000 in net FGD sales in 2008, which was 75.6% of the Company's total sales in 2007. According to the 10-K, this was an increase of 10.6%.

79.     Further, the 2009 10-K reported the following audited financial results: $192,642,506 in revenues for 2009, compared to revenues of $139,343 in revenues for 2008; gross profit of $72,313,275 for 2009, compared to $54,334,164 for 2008; and net income of $56,391,750 for 2009, compared to $21,281,724 for 2008.

80.     The foregoing financial results were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

81.     Attached as exhibits to the 2009 10-K were Certifications of the Company's CEO, Individual Defendant Zou; the Company's CFO, Individual Defendant Liu; and the Company's Chief Accounting Officer, Individual Defendant Yu, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In those Certifications, Individual Defendants Zou, Liu and YU certified, *inter alia*, that the Form 10-K contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-K disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

82.     The foregoing Certifications were materially false and misleading because the 2009 10-K included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that the "previously issued audited financial statements of the Registrant

for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009 . . . should no longer be relied on."

83.    On May 14, 2010, RINO filed its quarterly report for the period ended March 31, 2010, with the SEC on Form 10-Q (the "1Q 2010 Form 10-Q"). In that 10-Q the Company reported that FGD revenues for the first quarter 2010 of $33,938,000, approximately 70.9% of the Company's total revenues, compared to first quarter 2009 FGD revenues of $25,704,000, approximately 72.2% of RINO's total sales for the first quarter 2009.  According to the Company, this was a decrease of 32%.

84.    In the 1Q 2010 10-Q, RINO also reported revenues of $47,859,247, compared to revenues of $35,608,119 for the first quarter of 2009; gross profit of $16,699,520 for the first quarter 2010, compared to $15,950,638 in the first quarter 2009; and net income of $18,656,506, compared to net income of $12,474,916 for the same quarter in the prior year.

85.    The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that it had:

> concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the

Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

86.     Attached as exhibits to the 1Q 2010 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Wang, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In those Certifications, Individual Defendants Zou and Wang certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

87.     The foregoing Certifications were materially false and misleading because the 1Q 2010 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that that it had:

concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on.

The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

88.     On August 16, 2010, RINO filed its quarterly report for the period ended June 30, 2010, with the SEC on Form 10-Q (the "2Q 2010 Form 10-Q"). In that 10-Q the Company reported that FGD revenues for the second quarter 2010 of $42,426,000, approximately 64.8% of the Company's total revenues, compared to second quarter 2009 FGD revenues of $30,083,000, approximately 73.9% of RINO's total sales for the second quarter 2009.  According to the Company, this was an increase of 41%.

89.     In the 2Q 2010 10-Q, RINO also reported revenues of $65,383,668 (or $113,242,915 in revenues for the six months ended June 30, 2010), compared to revenues of $40,722,250 for the second quarter of 2009 (or $76,330,369 for the six months ended June 30, 2009); gross profit of $23,080,131 for the second quarter 2010 (or $39,779,651 for the six months ended June 30, 2010), compared to $14,167,569 in the second quarter 2009 (or $30,118,207 for the six months ended June 30, 2009); and net income of $20,436,248 (or $39,092,754 for the six months ended June 30, 2010), compared to net income of  $9,855,284 for the same quarter in the prior year (or $22,330,200 for the six months ended June 30, 2009).

90.     The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has

now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that it had:

> concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

91.    Attached as exhibits to the 2Q 2010 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Wang, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In those Certifications, Individual Defendants Zou and Wang certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

92.    The foregoing Certifications were materially false and misleading because the 2Q 2010 10-Q included revenues from FGD sales that the Company has

now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that that it had:

> concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

93.     On November 15, 2010, RINO filed its quarterly report for the period ended September 30, 2010, with the SEC on Form 10-Q (the "3Q 2010 Form 10-Q"). In that 10-Q the Company reported that FGD revenues for the third quarter 2010 of $42,935,000, approximately 81.5% of the Company's total revenues, compared to third quarter 2009 FGD revenues of $33,269,000, approximately 52.6% of RINO's total sales for the third quarter 2009.  According to the Company, this was an increase of 29.1%.

94.     In the 3Q 2010 10-Q, RINO also reported revenues of $52,724,560 (or $165,967,475 in revenues for the nine months ended September 30, 2010), compared to revenues of $63,302,203 for the third quarter of 2009 (or $139,632,572 in revenues for the nine months ended September 30, 2009); gross profit of $16,283,491 for the third quarter 2010 (or $56,063,142 for the nine months ended September 30, 2010),

compared to $26,133,067 in the third quarter 2009 (or $56,251,274 for the nine months ended September 30, 2009); and net income of $8,839,220 (or $47,931,974 for the nine months ended September 30, 2010), compared to net income of $17,085,900 for the same quarter in the prior year (or $39,416,100 for the nine months ended September 30, 2009).

95.    The foregoing financial results, however, were materially false and misleading because they included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that it had:

> concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

96.    Attached as exhibits to the 3Q 2010 10-Q were Certifications of the Company's CEO, Individual Defendant Zou, and the Company's CFO, Individual Defendant Wang, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  In those Certifications, Individual Defendants Zou and Wang certified, *inter alia*, that the Form 10-Q contained no untrue statements of material fact or material

omissions; the financial statements and information in the report fairly presented in all material respects the financial condition, results of operations and cash flows of the RINO; and that there Form 10-Q disclosed all material weaknesses in the design or operation of internal controls over the Company's financial reporting.

97.     The foregoing Certifications were materially false and misleading because the 3Q 2010 10-Q included revenues from FGD sales that the Company has now acknowledged were fabricated.  Moreover, on November 19, 2010, the Company announced that that it had:

> concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on. The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

## THE TRUTH IS REVEALED

98.     Five days before the Company filed its 3Q 2010 10-Q, on November 10, 2010, MW issued a research report in which it stated that RINO's 2009 income statement filed with the SAIC showed consolidated revenues of only $11.1 million, with the Company experiencing a net loss for 2009, as opposed to the $192.6 million

in revenues and $56.4 million in net income that the Company reported in its SEC filings.

99.    Moreover, the MW report indicated that MW had contacted the purported customers of RINO and "the Yueyufeng Steel Group ("Yueyufeng"), Yuhua Steel Co. Ltd ("Yuhua"), the Lai Steel Group ("Lai"), Chongqing Iron & Steel ("Chongqing"), Nanchang Changli Iron & Steel ("Changli), and most likely Bao Steel ("Bao")" had not purchased RINO FGD systems.

100.    The price of the Company's stock fell approximately 28% on the publication of the MW report, from a close of $15.52 per share on November 9, 2010, the day before the publication of the MW report, to a close of 11.10 per share on November 11, 2010, the first full trading day after the report was published.

101.    On November 11, 2010, an article entitled "RINO: Tax Evidence Completes the False Accounting Story," stated that original copies of the Value Added Taxes ("VAT") filing RINO submitted to the PRC's State Administration of Tax show that RINO reported revenues of only $8.9 million and paid almost no VAT in 2009.

102.    As stated above, on November 15, 2010, the Company announced its third quarter 2010 financial results.  On news of the disappointing third quarter 2010 results, the price of the Company's stock further dropped from a close of $11.01 per share on November 12, 2010, the last trading day prior to the publication of the

results, to a close of $7.55 per share on November 15, 2010, the day the third quarter results were released.

103.    On November 16, 2010, the Company postponed a previously scheduled earnings conference call.  On that news, the price of the Company's stock further dropped, from a close of $7.15 per share on November 16, 2010, to a close of $6.07 per share on November 17, 2010.  At midday on November 17, 2010, trading in RINO stock was suspended.

104.    On November 19, 2010, the Company filed the Forms 8-K with the SEC in which it acknowledged that certain of the allegations made by MW were accurate, and that the company had, in fact, fabricated the existence of at least two contractual relationships, and that the Company's previously reported financial statements for 2008, 2009 and 2010 should not be relied upon.

105.    Plaintiff and the members of the Class who were unaware that certain of the Company's contractual relationships were fabricated, and that RINO's financial results were, therefore, materially misstated, purchased their shares of RINO common stock at artificially inflated prices during the Class Period and have sustained injury thereby.

106.    On December 2, 2010, the Company announced that it had received a letter from the NASDAQ informing RINO that it would be delisted.  According to the Company:

The NASDAQ Letter stated that the statement by the Company's independent auditors that their audit reports for 2008 and 2009 can no longer be relied upon constitutes a violation by the Company of NASDAQ Listing Rule 5250(c)(1). The letter also states that the Company's failure to respond to a letter from the NASDAQ staff dated November 17, 2010 constitutes a violation of NASDAQ Listing Rule 5250(a).

The NASDAQ Letter further notified the Company that unless the Company requests an appeal of the NASDAQ staff's determination, trading of the Company's common stock will be suspended at the opening of business on December 8, 2010 and a Form 25-NSE will be filed by NASDAQ with the SEC, which will remove the Company's securities from listing and registration on NASDAQ.

The Company does not intend to appeal the NASDAQ staff's determination to delist the Company's common stock. Pending the delisting of the Company's common stock, which is expected to occur on December 8, 2010, the suspension of trading in the Company's common stock, which commenced on November 17, 2010, remains in effect.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

107.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired RINO common stock between May 15, 2008 and November 19, 2010, inclusive, seeking to pursue remedies under the Securities Act and Exchange Act.

108.   The members of the Class are so numerous that joinder of all members is impracticable.  There were 28,603,321 shares of common stock outstanding as of March 31, 2010.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes

that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by RINO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

109.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

110.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

111.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by the RINO Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial results of RINO; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

112.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

113.   The market for RINO's common stock was open, well-developed and efficient at all relevant times.  RINO common stock traded on the NASDAQ exchange under the symbol "RINO." As a result of these materially false and misleading statements and failures to disclose, RINO's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired RINO's common stock relying upon the integrity of the market price of RINO's common stock and market information relating to RINO, and have been damaged thereby.

114.   During the Class Period, the RINO Defendants materially misled the investing public, thereby inflating the price of RINO common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the RINO Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in

that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

115.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.

116.   As described herein, during the Class Period, the RINO Defendants made or caused to be made a series of materially false or misleading statements about RINO's FGD customers, FGD revenues, gross profits and net income. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of RINO and its financial well-being, business relationships, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  The RINO Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

117.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

118.   During the Class Period, Plaintiff and the Class purchased common stock of RINO at artificially inflated prices and were damaged thereby.  The price of RINO

common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

119.   As alleged herein, Defendants acted with scienter because they: (i) knew, or recklessly disregarded, that the public statements they issued or disseminated were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the inadequate internal controls at RINO, their control over, and/or receipt and/or modification of RINO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning RINO, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

120.   At all relevant times, the market for RINO's securities was an efficient market for the following reasons, among others:

(a)    RINO's stock was traded on the NASDAQ exchange with trading volume of in the hundreds of thousands and millions of shares throughout the Class Period;

(b)    As a regulated issuer, RINO filed periodic public reports with the SEC and the NASDAQ;

(c)    RINO regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    RINO was followed by securities analysts during the Class Period which were publicly available and entered the public marketplace.

121.   As a result of the foregoing, the market for RINO's  common stock promptly digested current information regarding RINO from all publicly-available sources and reflected such information in RINO's stock price.   Under these circumstances, all purchasers of RINO's common stock during the Class Period suffered similar injury through their purchase of RINO's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

122.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded

in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of RINO who knew that those statements were false when made.

## **FIRST CLAIM**

(Violation of Section 10(b) of The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants)

123.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase RINO common stock at artificially inflated prices.  In furtherance of this unlawful scheme,

plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

125.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for RINO common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

126.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about RINO's financial results, business relationships, and prospects, as specified herein.

127.   Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of RINO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about

RINO and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of RINO's common stock during the Class Period.

128.   The Individual Defendants primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period, and members of the Company's management team, the Board of director's Audit Committee, or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as  senior officers and/or directors of the Company were privy to data about the adequacy of the Company's internal controls, as well as its financial results; and (iii) the Individual Defendant were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

129.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of RINO's common stock. As demonstrated by Defendants' material misstatements about the Company's financial results

throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

130.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of RINO's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of RINO's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired RINO's common stock during the Class Period at artificially high prices and were damaged thereby.

131.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's inadequate internal controls and financial results, which were not disclosed by the RINO Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their RINO common stock, or, if they

had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

132.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

(Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants)

134.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135.   The Individual Defendants acted as controlling persons of RINO within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and awareness of the Company's operations and/or intimate knowledge of the false statements in connection with the Company's Class Period financial results and the adequacy of its internal controls that were disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff

contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to data about the Company's financial results and the adequacy of its internal controls, issued the statements that Plaintiff alleges are materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

136.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, as well as its financial reporting processes and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

137.   As set forth above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: December 10, 2010         **HAGENS BERMAN SOBOL SHAPIRO**

By: _____

REED R. KATHREIN

715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel.: (510) 725-3000
Fax: (510) 725-3001
reed@hbsslaw.com

**RIGRODSKY & LONG, P.A.**
SETH D. RIGRODSKY
BRIAN D. LONG
TIMOTHY J. MACFALL
585 Stewart Avenue, Suite 304
Garden City, New York 11530
Tel.: (516) 683-3516
Fax: (302) 654-7530

*Attorneys for Plaintiff Brenda Chau*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Brenda Chau ("Plaintiff"), hereby declare as to the following claims asserted under the federal securities laws that:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or to participate in this action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition or trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in RINO International Corporation (Nasdaq: RINO) securities that are the subject of this action:

| No. of Shares | Stock Symbol | Buy/Sell | Transaction Date | Price Per Share |
|---------------|--------------|----------|------------------|-----------------|
| 80  | RINO | Buy  | 11/4/2009  | $22.50 |
| 80  | RINO | Sell | 11/13/2009 | $27.02 |
| 200 | RINO | Buy  | 12/22/2009 | $28.00 |
| 200 | RINO | Sell | 1/7/2010   | $30.00 |
| 200 | RINO | Buy  | 1/15/2010  | $27.14 |
| 300 | RINO | Buy  | 3/19/2010  | $23.00 |
| 450 | RINO | Sell | 11/11/2010 | ~~$10.48~~ $10.50 |
| 50  | RINO | Sell | 11/17/2010 | $5.83 |

*Please list additional transactions on separate sheet of paper, if necessary.*

5.      Plaintiff will actively monitor and vigorously pursue this action for the Class' benefit.

6.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification: _____ NONE _____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as the Court orders or approves.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 2ND day of DECEMBER, 2010.

_Brenda Chau_

BRENDA CHAU

2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV10- 9517 RGK (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Reed R. Kathrein (139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000 Fax: (510) 725-3001

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BRENDA CHAU, Individually and On Behalf of All
Others Similarly Situated,

PLAINTIFF(S)

v.

RINO INTERNATIONAL CORPORATION,
JIANPING QIU, DEJUN ZOU, KENNITH C.
JOHNSON, XIE QUAN, ZEJIN LI, JENNY LIU,
BRUCE RICHARDSON, QUAN XIE DEFENDANT(S).
and WEIGUO ZHANG.

CASE NUMBER

CV 10- 09517 RGK ( PJWx)

**SUMMONS**

TO:      DEFENDANT(S): _____
_____

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer
or motion must be served on the plaintiff's attorney, Reed R. Kathrein _____, whose address is
715 Hearst Avenue, Suite 202, Berkeley, CA 94710 _____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.   You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: Dec. 13, 2010

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>BRENDA CHAU, Individually and On Behalf of All Others Similarly Situated | DEFENDANTS<br>RINO INTERNATIONAL CORPORATION, JIANPING QIU, DEJUN ZOU, KENNITH C. JOHNSON, XIE QUAN, ZEJIN LI, JENNY LIU, BRUCE RICHARDSON, QUAN XIE and WEIGUO ZHANG |
|---|---|
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Reed R. Kathrein (139304)<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>715 Hearst Avenue, Suite 202, Berkeley, CA 94710  Tel: (510) 725-3000 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No  ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Securities class action alleging violations of federal securities laws. 15 U.S.C. § 78j(b) and 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |

**FOR OFFICE USE ONLY:**   Case Number: _____ .

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   **CIVIL COVER SHEET**   Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑Yes
If yes, list case number(s): 2:10-cv-08695 VBF, 2:10-cv-01754 CJC and 2:10-cv-09011 VBF.

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☑A.  Arise from the same or closely related transactions, happenings, or events; or

☑B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☑C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Bruce Richardson – El Paso, TX |
| | Kennith Johnson – Suffolk County, NY |
| | All other defendants reside in the Peoples Republic of China |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _____   Date December 10, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |